1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WALTER V. LUCAS,                        No. CIV S-04-0586-GEB-CMK-P

12              Plaintiff,

13       vs.                                 FINDINGS AND RECOMMENDATIONS

14   B. ARNOLD,

15              Defendant.

16   _____/

17              Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18   to 42 U.S.C. § 1983.  Pending before the court is defendant's motion for summary judgment

19   (Doc. 86).  Plaintiff filed an opposition (Doc. 100) and defendant filed a reply (Doc. 101).

20              This case proceeds on the second amended complaint, deemed filed as of

21   December 27, 2005 (Doc. 54, Exhibit Y).  Defendant Arnold is the only named defendant in

22   plaintiff's second amended complaint.  Pursuant to the court's screening order issued on January

23   9, 2006 (Doc. 58), the second amended complaint states cognizable claims under the Eighth

24   Amendment and Fourteenth Amendment (limited to liberty interest violation).[1]

25   _____

26        [1]    Plaintiff also attempted to state a claim for a Fourteenth Amendment equal
     protection violation.  These allegations, however, were found to be vague conclusory statements

                                              1

# I. BACKGROUND

Defendant recites the following facts:

At all times relevant to the Complaint, Lucas was a state prisoner incarcerated at California State Prison-Sacramento ("CSP-Sac"), located in Represa, California.  At all time relevant to the Complaint, Defendant B. Arnold was a Correctional Officer employed by the [California Department of Corrections and Rehabilitation ("CDCR")] and assigned to [Deuel Vocational Institute ("DVI")], located in Tracy, California.

Starting as early as 1991, inmate Lucas began complaining of atypical chest pains.  Beginning in 1998, Lucas began having a history of myocardial infarctions, which is a disease state that occurs when the blood supply to a part of the heart is interrupted.  Lucas also suffers from coronary artery disease, hypertension, gastroesophageal reflux disease, asthma, and allergic rhinitis.  On August 1, 2002, CSP-Sac released Lucas for transportation to Doctor's Hospital at Manteca ("DHM") via Folsom Mercy Hospital for medical treatment.  On August 2, 2002, Lucas was transported to DHM.

On August 3, 2002, Arnold was working security as a Hospital Guard in the Intensive Care Unit ("ICU") at DVI's off-site medical facility, DHM.  Arnold's duties as a Hospital Guard included, among other things, protecting hospital staff and ensuring inmate patients comply with hospital rules and regulations.  On the morning of August 3, 2002, Arnold and another correctional officer accompanied an ICU nurse into inmate Lucas' patient room to provide security coverage.  Arnold observed inmate Lucas wearing a pair of unauthorized, cut-off, orange CDCR pants.  It is within the normal range of custody at DHM to require inmate patients to be dressed in hospital attire during their medical treatment.

Arnold issued an order for Lucas to remove his paints and change into hospital-approved attire.  Lucas refused Arnold's order to change his pants.  Arnold continued to issue verbal orders for Lucas to change his pants.  Pursuant to prison regulations, "Inmates and parolees must promptly and courteously obey written and verbal orders and instructions from department staff. . ." Cal. Code Regs. tit. 15 § 3005(b) (2006).  Lucas continued to refuse direct orders given by Arnold and the other officer.  The other

which failed to state a claim.  (See Screening Order, Doc. 58).  To the extent plaintiff's opposition refers to this claim, as well as others which were not raised in his complaint, these references are disregarded.  Similarly, plaintiff's previous complaints also named D. Millermon and Bernard Bacay as defendants.  However, plaintiff did not name these two individuals in his second amended complaint and they are therefore not defendants to this action.  Plaintiff's references in his opposition to Millermon as a defendant are similarly disregarded by the court.

officer asked the nurse to leave the room for her own safety. Arnold observed the other officer remove one leg iron and the Martin chain so Lucas could remove his pants.  A physical altercation ensued between inmate Lucas and the correctional officers.  Despite verbal orders for Lucas to submit and the use of physical strength and holds, Arnold and the other officer were unable to gain physical control over Lucas.  This necessitated the discharge of Oleoresin Capsicum ("OC") pepper spray in Lucas' facial area to bring him into compliance.  Per CDCR regulations defining "reasonable force," reasonable force includes, but is not necessarily limited to, "verbal persuasion or orders; physical strength and holds; chemical agents and/or other immobilization devices. . ."  Following the administration of OC pepper spray, Lucas submitted and was placed into handcuffs.  Lucas was decontaminated with water for fifteen minutes for his exposure to the OC pepper spray and escorted to another floor.

Immediately after the incident, Medical Technical Assistant ("MTA") C. Reich conducted a physical evaluation of Lucas and prepared a Medical Report of Injury of Unusual Circumstance (7219) ("Form 7219"), dated August 3, 2002.  Form 7219 indicated that Lucas refused to talk, that no cause of pain or discomfort was observed, and that Lucas' body appeared clear of any injury.  Form 7219 also indicated that Lucas did not allow the MTA to take his blood pressure and refused any medical treatment after the incident.  Reich medically cleared Lucas to return to custody.  This report is consistent with the findings in Lucas' medical file.  Dr. Bernard S. Bacay also conducted a medical examination of Lucas after the incident and prepared a Progress Note, dated August 3, 2002.  Dr. Bacay's report indicated that Lucas did not have any symptoms or chest pain, and did not appear to suffer any acute distress subsequent to the incident.  Dr. Bacay's report also indicated that a review of Lucas' laboratories revealed negative, or normal, cardiac enzymes, indicating that there was no serological evidence of myocardial injury.  A review of Lucas' medical file reveals that Lucas suffered no adverse effects from his exposure to the OC pepper spray discharged in his facial area.  Lucas' medical file also reveals that Lucas suffered no short-term adverse effects on his heart condition due to the August 3, 2002 incident.  Lucas received the proper medical treatment for his heart while at DHM.  Moreover, Lucas himself admits that his heart condition did not worsen after the August 3, 2002 incident.  Lucas' medical file also reveals that the officers' use of force on August 3, 2002 did not significantly delay or interfere with Lucas' medical treatment.

A thorough investigation conducted by Correctional Lieutenant B. Landingham after the incident concluded that "the actual force used by staff was within departmental policy and procedures."  A separate investigation and hearing also found Lucas guilty of Resisting Staff, a violation of California Code of Regulations § 3005(c).  Lucas did not file a tort claim with the

3

California Victim Compensation and Government Claims Board
for his state tort claims of sexual harassment/sexual assault relating
to this incident.

(Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, at 3-5 (citing Defendant's Statement of Undisputed Facts)).

In his "Summary of Plaintiff's Statement of Undisputed Facts in Support of Opposition to Motion for Summary Judgment," plaintiff challenges several aspects of defendant's story.  Plaintiff states that defendant Arnold never gave plaintiff "a direct order in a professional manner," plaintiff never refused to comply with an alleged direct order to remove his pants and that there never was a continuous verbal order for plaintiff to remove his pants. He also states he "was never ordered by defendant B. Arnold to change into hospital attire ... the defendant never provided plaintiff at no times any hospital garments to change into ... hospital garments at no times were ever discussed or issued to plaintiff."  He also states that defendant used unnecessary force for a minor situation.  Plaintiff further states that "the defendant significantly delayed and interfered with plaintiff's medical treatment by disconnecting plaintiff medication I.V. needle and disconnecting his heart monitor."  (Opposition at 23-25).

## II.  APPLICABLE LEGAL STANDARDS

### A.  <u>Motion for Summary Judgment</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1  committee's note on 1963 amendments).

2  In resolving the summary judgment motion, the court examines the pleadings,

3  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4  any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See

5  Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed

6  before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

7  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8  produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

9  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10  1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11  show that there is some metaphysical doubt as to the material facts . . . . Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

14  ## II.  DISCUSSION

15  ### A.  Eighth Amendment Violation

16  The treatment a prisoner receives in prison and the conditions under which the

17  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

18  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

19  511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts

20  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

21  (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v.

22  Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with

23  "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

24  801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only

25  when two requirements are met: (1) objectively, the official's act or omission must be so serious

26  such that it results in the denial of the minimal civilized measure of life's necessities; and (2)

1  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

2  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

3  official must have a "sufficiently culpable mind."  See id.

4                                    **1.**        **Interference with Medical Treatment**

5            Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

6  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at

7  105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental

8  health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is

9  sufficiently serious if the failure to treat a prisoner's condition could result in further significant

10  injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d

11  1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

12  Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

13  is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

14  activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See

15  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

16            The requirement of deliberate indifference is less stringent in medical needs cases

17  than in other Eighth Amendment contexts because the responsibility to provide inmates with

18  medical care does not generally conflict with competing penological concerns.  See McGuckin,

19  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

20  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

21  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

22  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

23  treatment, or interference with medical treatment, may also constitute deliberate indifference.

24  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also

25  demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

26  / / /

1    As an essential element of his Eighth Amendment claim, plaintiff must establish
2  that defendant acted with deliberate indifference to a serous medical condition.  This includes
3  action with the intent to delay treatment, if it led to further injury.  Defendant has presented
4  evidence which shows that plaintiff did not suffer any further injury as a result of defendant's
5  actions.   Defendant's evidence includes a declaration from Dr. Kinji Hawthorne.  After
6  reviewing plaintiff's medical records, Dr. Hawthorne opined that there was no significant delay
7  or interference with plaintiff's medical treatment.  Plaintiff was examined immediately after the
8  incident by a medical technical assistant, and although plaintiff refused to cooperate with the
9  examination, no physical injury was found and plaintiff was cleared to return to custody.  On the
10  same day, plaintiff was also examined by Dr. Bacay, who found that plaintiff did not have any
11  symptoms, did not have any chest pains during the ordeal, and did not appear to be in any acute
12  distress.  Plaintiff's cardiac enzymes and vital signs were normal and stable.  Dr. Hawthorne also
13  opined that plaintiff did not suffer any short-term effects from the incident, and due to plaintiff's
14  other health problems unrelated to the incident, he likely will not suffer any long-term effects
15  either.

16    The burden thus shifts to plaintiff to present evidence which establishes that a
17  genuine dispute of fact exists as to this essential element.  Plaintiff can meet this burden by
18  presenting evidence that any delay led to further injury, or that defendant's actions were
19  malicious and deliberately intended to cause plaintiff harm.  Plaintiff claims that defendant
20  Arnold interfered with his medical treatment by using excessive force against plaintiff.  He also
21  states in his second amended complaint that defendant "snatched plaintiff's 'heart monitor' off
22  and maliciously snatched out one of the I.V. needles in plaintiff's arms- which caused severe
23  pain." (SAC at 4).  Plaintiff has not provided to the court any evidence to support his claim that
24  defendant interfered with his medical treatment or that defendant acted wantonly for the purpose
25  of inflicting harm.  There is no evidence that demonstrates any delay which led to further injury.
26  The examinations by medical professionals immediately following the incident show that

plaintiff did not suffer any negative effects.  In addition, plaintiff attached medical records to his

opposition which indicate that he was seen by the cardiologist on August 8, 2002.  Therefore,

plaintiff's own documents support defendant's position that there was no significant delay in

plaintiff receiving the medical treatment he was in the hospital to receive.

Based on the current record, the court concludes that there is no genuine dispute

as to there being a delay in plaintiff receiving medical treatment for his heart condition.  Plaintiff

has not presented evidence to show otherwise.  Therefore, because plaintiff cannot establish an

essential element of his Eighth Amendment claim, summary adjudication in favor of defendant is

appropriate.  See Fed. Rule Civ. Proc. 56(d).

## 2.        Excessive Force

When prison officials stand accused of using excessive force, the core judicial

inquiry is ". . . whether force was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992);

Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  The "malicious and sadistic" standard, as

opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims,

is applied to excessive force claims because prison officials generally do not have time to reflect

on their actions in the face of risk of injury to inmates or prison employees.  See Whitley, 475

U.S. at 320-21.  In determining whether force was excessive, the court considers the following

factors: (1) the need for application of force; (2) the extent of injuries; (3) the relationship

between the need for force and the amount of force used; (4) the nature of the threat reasonably

perceived by prison officers; and (5) efforts made to temper the severity of a forceful response.

See Hudson, 503 U.S. at 7.  The absence of an emergency situation is probative of whether force

was applied maliciously or sadistically.  See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir.

1993) (en banc).  The lack of injuries is also probative.  See Hudson, 503 U.S. at 7-9.  Finally,

because the use of force relates to the prison's legitimate penological interest in maintaining

security and order, the court must be deferential to the conduct of prison officials.  See Whitley,

1   475 U.S. at 321-22.

2        Plaintiff's claim of excessive force encompasses all of defendant's actions on

3   August 3, 2002.  As an essential element of his Eighth Amendment claim, plaintiff must

4   establish that force was not used in a good-faith effort to maintain prison order but, rather, was

5   used maliciously and sadistically for the purpose of causing him harm.  As stated above, plaintiff

6   and defendant have different versions of what took place in plaintiff's hospital room on that day.

7   According to defendant, he gave plaintiff a direct order which plaintiff failed to follow.  Plaintiff

8   then resisted defendant's action to compel compliance with the order.  When plaintiff resisted,

9   defendant used reasonable force to quell the resistance including physical strength and holds, and

10  finally O.C. pepper spray.  Defendant has presented evidence – in the form of declarations from

11  prison supervisors and investigations into the incident– which shows that he acted reasonably and

12  for the purpose of maintaining prison discipline in the face of plaintiff's refusal to comply with a

13  correctional officer's order.

14       The burden thus shifts to plaintiff to present evidence which establishes that a

15  genuine dispute of fact exists as to this essential element.  Plaintiff can meet this burden by

16  presenting evidence that force was not used to restore order but was used solely to cause plaintiff

17  harm.  The essence of plaintiff's version is that he did not understand[2] any direct order from

18  defendant that he was to remove his prison pants and put on proper hospital attire.  In support of

19  this self-serving and conclusory statement, plaintiff states that at no time was he given the proper

20  hospital attire to change into.  In essence, he claims that defendant's actions were not applied in a

21  good-faith effort to maintain or restore discipline (by bringing plaintiff in line with hospital

22  policy that inmate patients wear appropriate hospital attire), but rather defendant acted

23

24      [2]    Plaintiff actually states that defendant did not give plaintiff a direct order "in a
    professional manner."  However, according to the incident report, the 115 rules violation report,

25  and plaintiff's 602 inmate appeal, it appears to the court that plaintiff did in fact receive a direct
    order from the defendant to remove his pants.  Plaintiff indicates that he did not understand this

26  order and feared that he was going to be the victim of rape due to defendant's assaultive
    behavior.

maliciously and sadistically to cause him harm.  As further support of his position, plaintiff

provides the court with the prison's review of the incident as stated in the Incident Commander's

Review/Critique Use of Force Incidents, attached to plaintiff's opposition to the motion.  In this

report, Correctional Lieutenant Facio found that defendant's actions prior to the use of force were

not in compliance with policy, procedures and training.  In that report, Lieutenant Facio stated

that although plaintiff, in wearing the prison pants, was violating hospital regulations, it was not

a breach of security.  A reasonable inference from this information, which must be drawn in

favor of the opposing party, is that defendant's actions were not a good-faith effort to maintain or

restore discipline, but rather, were a malicious and sadistic intent to cause plaintiff harm.

Based on the current record, the court concludes that there is a genuine dispute of

a material fact, with respect to the purpose of defendant's actions.  Specifically, the plaintiff has

presented evidence to show that defendant's actions may not have been intended to maintain or

restore discipline, but rather, were malicious and sadistic with the intent to cause plaintiff harm.

Therefore, summary adjudication in favor of defendant is not appropriate on this claim.  See Fed.

Rule Civ. Proc. 56(d).

### B.    Due Process Liberty Interest

The Due Process Clause protects prisoners from being deprived of life, liberty, or

property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  There are

two types of due process claims: procedural due process and substantive due process.   The

procedural guarantees of the Fifth and Fourteenth Amendments' Due Process Clauses apply only

when a constitutionally protected liberty or property interest is at stake.  See Ingraham v. Wright,

430 U.S. 651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).  In order to prevail

on a claim of deprivation of due process, a plaintiff must first establish the existence of a liberty

or property interest for which the protection is sought.  See Ingraham, 430 U.S. at 672; Bd. of

Regents, 408 U.S. at 569.

/ / /

1    Liberty interests can arise both from the Constitution and from state law.  See

2 Hewitt v. Helms, 459 U.S. 460, 466 (1983); Meachum v. Fano, 427 U.S. 215, 224-27 (1976);

3 Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).  In determining whether the Constitution

4 itself protects a liberty interest, the court should consider whether the practice in question "is

5 within the normal limits or range of custody which the conviction has authorized the State to

6 impose."  Wolff, 418 U.S. at 557-58; Smith, 994 F.2d at 1405.  Applying this standard, the

7 Supreme Court has concluded that the Constitution itself provides no liberty interest in good-

8 time credits, see Wolff, 418 U.S. at 557; in remaining in the general population, see Sandin v.

9 Conner, 515 U.S. 472, 485-86 (1995); in not losing privileges, see Baxter v. Palmigiano, 425

10 U.S. 308, 323 (1976); in staying at a particular institution, see Meachum, 427 U.S. at 225-27; or

11 in remaining in a prison in a particular state, see Olim v. Wakinekona, 461 U.S. 238, 245-47

12 (1983).

13    In determining whether state law confers a liberty interest, the Supreme Court has

14 adopted an approach in which the existence of a liberty interest is determined by focusing on the

15 nature of the deprivation.  See Sandin, 515 U.S. at 481-84.  In doing so, the Court has held that

16 state law creates a liberty interest deserving of protection only where the deprivation in question:

17 (1) restrains the inmate's freedom in a manner not expected from the sentence; and (2) "imposes

18 atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

19 life."  Id. at 483-84.  Prisoners in California have a liberty interest in the procedures used in

20 prison disciplinary hearings where a successful claim would not necessarily shorten the

21 prisoner's sentence.  See Ramirez v. Galaza, 334 F.3d 850, 853, 859 (9th Cir. 2003) (concluding

22 that a due process challenge to a prison disciplinary hearing which did not result in the loss of

23 good-time credits was cognizable under § 1983); see also Wilkinson v. Dotson, 544 U.S. 74, 82

24 (2005) (concluding that claims which did not seek earlier or immediate release from prison were

25 cognizable under § 1983).

26 / / /

1          Here, plaintiff was subject to a CDC 115 Rules Violation Report.  In that report,

2   plaintiff was charged with battery on a peace officer without serious injury and was referred to

3   the District Attorney's Office for prosecution (which declined to prosecute).  Plaintiff was found

4   guilty of violating California Code of Regulations § 3005(c), resisting staff, a reduction of the

5   original charge.  However, plaintiff does not claim any procedural due process violations

6   regarding these proceedings.  In fact, he does not mention these proceedings at all in either his

7   second amended complaint or his opposition to this motion.  Therefore, the court cannot find any

8   procedural due process violation.

9                    To establish a violation of substantive due process . . . , a
            plaintiff is ordinarily required to prove that a challenged
10          government action was clearly arbitrary and unreasonable, having
            no substantial relation to the public health, safety, morals or
11          general welfare.  However, where a particular amendment provides
            an explicit textual source of constitutional protection against a
12          particular sort of government behavior, that Amendment, not the
            more generalized notion of substantive due process, must be the
13          guide for analyzing a plaintiff's claims.

14   Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996) (overruled on other grounds) (citations,

15   internal quotations, and brackets omitted); see also County of Sacramento v. Lewis, 523 U.S.

16   833, 841-42 (1998).

17          In this case, plaintiff claims defendant did not follow the proper policies and

18   procedures as found by the prison's internal investigation in to the incident at the hospital.

19   However, whether the defendant followed the proper policies and procedures relate to his Eighth

20   Amendment claim, and as stated above, that must be the guide for analyzing his claims.  The

21   violation of any policy or procedure in this matter does not raise a separate due process claim.

22   Accordingly, summary adjudication in favor of defendant is appropriate on this claim.  See Fed.

23   Rule Civ. Proc. 56(d).

24          **C.      State Claims**

25          Plaintiff also asserts racial and sexual harassment claims, both of which are based

26   in state law.  See e.g., Cal. Civ. Code §§ 51.7, 51.9.  As defendant avers, the California Tort

1   Claims Act (Cal. Gov. Code §§ 810 - 996.6) requires that before plaintiff can file a civil

2   complaint for damages against a public entity, he must first present his claim to the public entity.

3   See Munoz v. California, 39 Cal. Rptr. 2d 860, 863-64 (Cal. App. 1995).  Defendant states that

4   plaintiff failed to file a claim with the California Victim Compensation and Government Claims

5   Board, as required.  Defendant provides to the court a portion of plaintiff's deposition in which

6   plaintiff confirms that he did not file a California tort claim.  Plaintiff has not provided the court

7   with any allegation or evidence that he did in fact file a claim as required.  Therefore, summary

8   adjudication in favor of defendant is appropriate on these claims.  See Fed. Rule Civ. Proc. 56(d).

9          **D.     Qualified Immunity**

10          Finally, defendant asserts he is entitled to qualified immunity.  Government

11   officials enjoy qualified immunity from civil damages unless their conduct violates "clearly

12   established statutory or constitutional rights of which a reasonable person would have known."

13   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general, qualified immunity protects "all but

14   the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S.

15   335, 341 (1986).  In ruling upon the issue of qualified immunity, the initial inquiry is whether,

16   taken in the light most favorable to the party asserting the injury, the facts alleged show the

17   defendant's conduct violated a constitutional right.  See Saucier v. Katz, 533 U.S. 194, 201

18   (2001).  If, and only if, a violation can be made out, the next step is to ask whether the right was

19   clearly established.  See id.  This inquiry "must be undertaken in light of the specific context of

20   the case, not as a broad general proposition . . . ."  Id.  "[T]he right the official is alleged to have

21   violated must have been 'clearly established' in a more particularized, and hence more relevant,

22   sense:  The contours of the right must be sufficiently clear that a reasonable official would

23   understand that what he is doing violates that right."  Id. at 202 (citation omitted).  Thus, the final

24   step in the analysis is to determine whether a reasonable officer in similar circumstances would

25   have thought his conduct violated the alleged right.  See id. at 205.

26          When identifying the right allegedly violated, the court must define the right more

14

1  narrowly than the constitutional provision guaranteeing the right, but more broadly than the

2  factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

3  (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

4  sufficiently clear that a reasonable official would understand [that] what [the official] is doing

5  violates the right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the

6  court concludes that a right was clearly established, an officer is not entitled to qualified

7  immunity because a reasonably competent public official is charged with knowing the law

8  governing his conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even

9  if the plaintiff has alleged a violation of a clearly established right, the government official is

10  entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that

11  his . . . conduct did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th

12  Cir. 2001); see also Saucier, 533 U.S. at 205.

13          The first two steps in the qualified immunity analysis involve purely legal

14  questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a

15  legal determination based on a prior factual finding as to the government official's conduct.  See

16  Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must

17  view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

18  in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

19          In this case, viewing the facts as alleged in the light most favorable to plaintiff, the

20  court must conclude that plaintiff has made a prime facie case of an Eighth Amendment

21  violation.   As stated above, in determining whether force was excessive, the court considers the

22  following factors: (1) the need for application of force; (2) the extent of injuries; (3) the

23  relationship between the need for force and the amount of force used; (4) the nature of the threat

24  reasonably perceived by prison officers; and (5) efforts made to temper the severity of a forceful

25  response.  See Hudson v. McMillian, 503 U.S. 1, 7 (1992).  The absence of an emergency

26  situation is probative of whether force was applied maliciously or sadistically.  See Jordan v.

1   <u>Gardner</u>, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc).  The lack of injuries is also probative.

2   <u>See</u> <u>Hudson</u>, 503 U.S. at 7-9.

3          In applying these five factors, the court uses plaintiff's version of the facts: that

4   defendant did not give him a direct order that he understood, that he was never provided with any

5   hospital attire to change into, there was no security breach, that defendant was in control of the

6   situation the entire time, that defendant's actions violated the CDCR's policies and procedures

7   leading up to the use of force, and that defendant was simply harassing him.

8          1.  The need for force: Pursuant to the prison's investigation into the incident, the

9   prison found defendant's action leading up to the use of force was in violation of the policies and

10  procedures.  This would indicate that no force was needed to remedy the situation.  The prison's

11  report indicates that defendant should have instructed plaintiff to return to his bed, placed

12  restraint equipment on plaintiff and contacted his supervisor for assistance in remedying the

13  situation (of plaintiff not wearing approved hospital attire).  If defendant had followed the proper

14  procedure, there would have been no need for any force.  In addition, the absence of an

15  emergency situation is probative of whether force was applied maliciously or sadistically, and

16  here the court cannot find that there existed an emergency situation.

17         2.  The extent of injuries: Plaintiff indicates that during the scuffle with defendant,

18  his IV needle was pulled out and caused him severe pain in his arm.  Although there may not

19  have been a lasting, permanent injury, taking plaintiff's version of the facts, he was in significant

20  pain during the incident which would indicate some injury.  Although no injury is probative, here

21  there was some injury.  There is no requirement that the injury be serious.  <u>See</u> <u>Hudson</u>, 503 U.S.

22  at 4.

23         3.  The relationship between the need for force and the amount of force used: As

24  discussed above, there was no need for force and therefore any amount of force used would be

25  unreasonable.

26         4.  The nature of the threat reasonably perceived by defendant: Defendant claims

16

that plaintiff, in wearing prison issued pants, was in violation of hospital policy that inmate patients wear hospital attire.  True as that may be, even the prison found that there was no breach of security.  Therefore, defendant could not have reasonably perceived any threat by defendant's actions.

5.  Efforts to temper the severity of a forceful response: Based on the facts presented to the court, there does not appear to have been any effort on the part of defendant to temper the severity of a forceful response.  The prison investigation indicates that plaintiff should have been ordered to return to his bed, restraints put on, and contact be made with the supervisor for assistance.  Defendant did not do any of that in this case.  Instead, he took the matter into his own hands and, with the help of a fellow officer, attempted to force plaintiff into compliance with their order to remove his pants.   A logical outcome of that sort of order would have been plaintiff's resistance to being forcefully stripped and left naked, as he was not provided with any hospital attire to wear.

Accordingly, based on the facts presented in the light most favorable to plaintiff, the court would find that plaintiff has made a prime facie case of an Eighth Amendment violation.  The next question is whether the Eighth Amendment right allegedly violated is clearly established.  A prisoner's right against the use of excessive force is clearly established.  See, e.g., Hudson, 503 U.S. 1.

The final question in the qualified immunity analysis is whether defendant reasonably believed that his conduct did not violate the Eighth Amendment.  Viewing the facts of this case in the light most favorable to plaintiff, the court concludes that defendant could not reasonably, but mistakenly believe that his conduct was constitutionally permissible.  To support this finding the court turns to the prison's review of the incident as stated in the Incident Commander's Review/Critique Use of Force Incidents, attached to plaintiff's opposition to the motion.  In this report, Correctional Lieutenant Facio found that defendant's actions prior to the use of force were not in compliance with policy, procedures and training.  Lieutenant Facio

specifically found that

> This use of force is not in compliance with departmental policy, procedure and training. . . . The Hospital Sergeant was not notified of the situation regarding inmate Lucas's clothing.  Preventative measures could have been taken to have inmate Lucas comply with the verbal orders, whereas the supervisor could have assessed the situation.  This was a violation of hospital policy and Operational Procedure #41, but not a breach of security.  Inmate Lucas was supervised by two (2) correctional staff and had on restraint equipment.

(See Opposition (Doc. 100), Exhibit D).

In addition, Custody Captain Reyes, in reviewing Lieutenant Facio's report, also found defendant's action prior to the use of force to be in violation of department policy, procedures and training.  Captain Reyes suggested that defendant "should have de-escalated the situation by instructing inmate Lucas to return to his bed and placing the restraint equipment on accordingly.  The Hospital supervisor should have been contacted and an assessment on the clothing attire could have been decided."  (See Opposition (Doc. 100), Exhibit E).  In fact, Captain Reyes suggested follow-up training for defendant.  (See id.)  Associate Warden M.A. Hamilton agreed with the assessment of the first level reviewer, and agreed that training will be provided.  (See Opposition (Doc. 100), Exhibit F).  Although these reports indicate that defendant's actions during and after the use of force were in compliance with CDCR policy, procedures and training, this is interpreted to mean that the techniques defendant used were in compliance, which is a different question than whether the force used was reasonable given the situation.

Under these circumstances, a reasonable officer, in compliance with CDCR policies and procedures, as stated by the prison supervisors, would have contacted the Hospital Sergeant who could have taken preventative measures.  In addition, although plaintiff may not have complied with defendant's verbal orders, as Lieutenant Facio stated, wearing prison clothing may be against hospital policy but it is not a breach of security.  The entire situation could have been avoided if defendant had acted as a reasonable officer would have in the

situation.  Therefore, the court finds that defendant is not entitled to qualified immunity.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.   Defendant's motion (Doc. 86) be granted in part and denied in part;

2.   Summary adjudication is appropriate for the following claims:

(a)   interference with medical treatment in violation of the Eighth Amendment;

(b)   due process liberty interest violation of the Fourteenth Amendment; and

(c)   racial/sexual harassment;

3.   Summary adjudication is not appropriate for plaintiff's claim of excessive force in violation of the Eighth Amendment;

4.   Defendant is not entitled to qualified immunity; and

5.   This case should proceed on plaintiff's excessive force claim only, all other claims should be dismiss.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 1, 2007

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE